IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

DOROTHY MAE JOHNSON, surviving spouse; )
and LOIS TOWNES, as Next of Kin to )
J. DEAN JOHNSON, deceased, )
    Plaintiff, )
)
v. ) No. 2:12-cv-02664-STA-tmp
)
MEMPHIS LIGHT, )
GAS & WATER DIVISION )
    Defendant. )

# ORDER GRANTING MLGW'S MOTION TO EXCLUDE TESTIMONY
# OF MIGUEL LABOY, M.D.

Plaintiffs filed this lawsuit against Defendant Memphis Light Gas & Water Division ("MLGW'), alleging that MLGW wrongfully and negligently failed to provide utility service to their decedent J. Dean Johnson and that such refusal led to Johnson's death as the result of hyperthermia or heat stroke. (Cmplt. ECF No.1-2.) Defendant MLGW has filed a motion to exclude the testimony of Plaintiffs' expert, Miguel Laboy, M.D., as to Johnson's cause of death. (ECF No. 111.) Plaintiffs have responded to the motion (ECF No. 122), and Defendant was granted permission to file a reply. (ECF No. 125.) For the reasons set forth below, Defendant's motion is **GRANTED**.[1]

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.

---

[1] The Court granted Defendant's motion to strike on March 8, 2016, and noted that Plaintiffs had not responded to the motion. (ECF No. 119.) Plaintiffs moved to set aside that order on the ground that they had inadvertently failed to file a motion for an extension of time in which to file a response. (ECF No. 120.) Defendant did not oppose the motion to set aside the order in order to allow Plaintiffs to respond. On March 9, 2016, the Court granted Plaintiff's motion and set aside the order that had granted Defendant's motion to strike. (ECF No. 121.)

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.[2]

In determining whether expert testimony is admissible, the Court is charged with ensuring that all expert testimony that is admitted is relevant and reliable.[3] The Court's "fundamental objective is to generally evaluate, based on whatever factors are important to the particular case, the relevancy and reliability of the testimony…."[4]

Dr. Laboy is the medical examiner who performed Johnson's autopsy. Plaintiffs' expert witness disclosures disclose Dr. Laboy as an expert witness and state that Dr. Laboy "will testify along the lines of his report that J. Dean Johnson's cause of death resulted from probable heat stroke due to the fact that he was inside his secured apartment, which did not have any utilities and the temperature in the bedroom was 93.2 degrees, with 63% of humidity, and that the manner of his death is accident. He will also testify that Plaintiff J. Dean Johnson had no significant medical history."[5]

Defendant contends that Dr. Laboy's conclusion that Johnson's cause of death "resulted from probable heat stroke" should be excluded on the grounds that it is not expressed to the requisite degree of medical certainty, it will not assist the jury in understanding the evidence or in determining a fact in issue, and the opinion is unreliable because Dr. Laboy's methodology is

---

[2] Fed. R. Evid. 702.

[3] *Daubert v. Merrell Dow Pharm., Inc.*, 590 U.S. 579, 589 (1993).

[4] *Smith v. Prudential Ins. Co.*, 2012 WL 1965405 at *2 (M.D. Tenn. May 31, 2012) (citing *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)).

[5] (Pls' Exp Disc., ECF No. 111-1.)

flawed and Dr. Laboy did not reliably rule in or rule out other potential causes of Johnson's death. The Court finds that Defendant's contentions are meritorious.

As noted by Defendant, Dr. Laboy's opinion that Johnson died of "probable heat stroke" does not meet the standard for admissibility of medical causation testimony, although the fact that an expert "does not use absolute terms but rather couches the opinions in terms of 'can' or 'may' does not render it speculative or unreliable."[6] However, when, as here, the plaintiff alleges that the defendant's conduct caused the decedent's death,

> [t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough…a doctor's testimony that a certain thing is possible is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a "possible" cause of death.[7]

Dr. Laboy's opinion regarding the cause of Johnson's death fails to meet this standard.

During his deposition, Dr. Laboy referred to the cause of Johnson's death as "probable heat stroke," rather than heat stroke. Dr. Laboy's testimony establishes that his opinion regarding "probable heat stroke" does not mean that heat stroke was more likely than not the cause of death. Instead, Dr. Laboy used "probable" because he could not find another explainable cause of death.[8] Dr. Laboy's opinion is speculative and will not assist the jury to determine any fact in

---

[6] *In re Heparin Products Liability Litigation*, 803 F. Supp.2d 712, 745 (N.D. Ohio 2011) (citation omitted). *See also Daubert*, 509 U.S. at 590 (finding that to be considered appropriately scientific, the expert need not testify to what is "known to a certainty" but must only state "an inference or assertion ... derived by the scientific method").

[7] *Brooks v. United States*, 2011 WL 3882288 at *6 (E.D. Tenn. Sept. 2, 2011) (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861-62 (Tenn. 1985)).

[8] (Dep. Dr. Laboy, pp. 59 - 60, ECF No. 111-5) (Q: "What does 'probable' mean?" A: "Probable means that after reviewing everything there's no other thing that I can attribute the cause of death. And with all the circumstances and evidence at the time, level of histology, I did not find an explainable cause of death for this case.").

issue. It is merely Dr. Laboy's observation that Johnson's death may have been due to heat stroke and is no more helpful that the jury's own speculation as to Johnson's cause of death.[9]

Plaintiffs insist that Dr. Laboy's use of the phrase "probable heat stroke" does not mean that his opinion was speculative. Instead, they assert that his opinion was in the form of a differential diagnosis, which "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely cause until the most probable one is isolated."[10] Plaintiffs contend that "the Sixth Circuit holds that 'doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible.'"[11] According to Plaintiffs, Dr. Laboy's testimony is "analogous" to the testimony admitted in *Jahn v. Equine Servs., PSC*.[12]

Although Plaintiffs are correct that not every "conceivable cause" must be ruled out to make a differential diagnosis admissible, the *Best* Court pointed out that "[n]ot every opinion that is reached via a differential-diagnosis method will meet the standard of reliability required by *Daubert*."[13] The *Best* Court adopted the following test to determine when a differential diagnosis is reliable and admissible.

---

[9] *See Wilson v. General Motors Acceptance Corporation*, 2008 WL 2593792 *3 (E.D. Tenn. April 3, 2008) ("A doctor's testimony that a certain thing is possible is no evidence at all. His opinion as to what is possible is no more valid that the jury's own speculation as to what is or is not possible.").

[10] *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178 (6th Cir. 2009). A differential diagnosis is as "an appropriate method for making a determination of causation for an individual instance of disease." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001).

[11] (Pls' Resp. p. 1 (quoting *Best*, 563 F.3d at 181), ECF No. 122.)

[12] 233 F.3d 382, 390 (6th Cir. 2000).

[13] *Best*, 563 F.3d at 179.

> A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent possible, the nature of the patient's injury, [*In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 762 (3d Cir.1994] ("A physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and ... should ... determine that a patient is ill and what illness the patient has contracted."), (2) "rules in" one or more causes of the injury using a valid methodology, and (3) engages in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion as to which cause is most likely. *Id.* at 760.[14]

Thus, expert opinion testimony on the subject of causation may be in the form of a differential diagnosis if three questions can be answered in the affirmative: (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? and (3) Did the expert reliably rule out the rejected causes?[15] "If the court answers 'no' to any of these questions, the court must exclude the ultimate conclusion reached."[16] With respect to the third prong, if the physician "engages in very few standard diagnostic techniques by which doctors normally rule out alternative causes, the doctor must offer a good explanation as to why his or her conclusion remains reliable. Similarly, the doctor must provide a reasonable explanation as to why he has concluded that any alternative cause suggested by the defense was not the sole cause."[17]

Dr. Laboy's methods do not comport with these standards. Although Dr. Laboy acknowledged that his autopsy findings were consistent with cardiac arrest,[18] he did not explain

---

[14] *Id.*

[15] *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (citing *Best*, 563 F.3d at 179).

[16] *Id.*

[17] *Best*, 563 F.3d at 179.

[18] (Dep. Dr. Laboy, p. 81, ECF No. 125-1) ("Q. If Mr. Johnson had died from sudden cardiac death, if that was the cause of death, the findings in your autopsy would be consistent with that,

why cardiac arrest was not the sole cause of death, and, thus, he did not "reliably rule out" cardiac arrest.

Plaintiffs attempt to rely on *Jahn v. Equine Servs., PSC*.[19] for the proposition that "speculative" expert testimony as to the cause of death may be admissible in certain circumstances. In *Jahn*, a champion pony died after surgery. Although the plaintiff's experts did not know the exact cause of the pony's death and could only speculate, the Court of Appeals held that "by implying that specific knowledge of the precise physiological cause of Night Passage's death is a prerequisite to admissibility, we believe that the district court held the experts up to entirely too strict a standard when considering the admissibility of their testimony."[20]

As pointed out by Defendant, *Jahn* is inapposite to the present case because the specific cause of the pony's death was not material to the opinions of the plaintiff's experts as to the care of the pony before and after surgery.[21] Thus, it was not necessary for the plaintiff to prove a precise cause of death to prevail on her claims. Additionally, of importance to the Court of Appeals, was the fact that the *Jahn* defendant had kept poor medical records for the pony.

> Hampered by a lack of post-operative medical records, Jahn has called on her expert witnesses to use their expertise to piece together what probably happened to her now-dead horse. If Equine Services had kept records, Drs. Mundy and Robbins could probably have stated their opinions in a more illuminating fashion, and it might have been possible for the witnesses to precisely determine the physiological cause of Night Passage's death. Both experts noted that their analysis was hampered by the lack of records, and it seems patently unfair to

---

right? A. Usually there has to be an etiology to it and, yeah, my findings would be consistent. Q. With sudden cardiac death? A. Yeah. And the circumstances surrounded too.")

[19] 233 F.3d 382, 390 (6th Cir. 2000)

[20] *Id.* at 389-90.

[21] *Id.* at 390.

6

allow Equine Services to benefit from what seems to be a deplorable, and perhaps even negligent, absence of record-keeping.[22]

Plaintiffs in the present case have not contended that Defendant in any way was responsible for the dearth of medical records for the decedent, nor is there any evidence of such.

Additionally, *Jahn* is inapposite because, in that case, the district court erred by weighing the opinions of the plaintiff's experts against those of the pathologist – a factor not present in this case. "[C]omparing two pieces of evidence and determining which is more credible should be left for the finder of fact and should not be considered when ruling on Rule 702 admissibility."[23]

Plaintiffs attempt to rely on *State of Tennessee v. Bond*[24] for the proposition that determining the cause of death is an imprecise science. In *Bond*, the cause of the victim's death was not challenged. Instead, the issue was whether the "trial court erred by allowing the state to bolster the medical examiner's credibility by testifying about his naval experience."[25] Moreover, Plaintiffs have misread certain statements in *Bond*. The *Bond* Court did not hold that "determining the cause of death is an imprecise science." Instead, that sentiment is attributable to the medical examiner who "conceded that determining a cause of death is not an 'exact science.'"[26]

---

[22] *Id.*

[23] *Id.* at 391 (*citing Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir. 1998) (reversing district court's exclusion of expert testimony because "[u]ltimately, the trial court failed to distinguish between the threshold question of admissibility of expert testimony and the persuasive weight to be accorded such testimony by a jury")).
.
[24] 2006 WL 2689688 (Tenn. Crim. App. Sept. 20, 2006).

[25] *Id.* at *10.

[26] *Id.* at *5.

The facts in *Bailey v. United States*,[27] are more akin to those in this case than the facts in either *Jahn* or *Bond*. In *Bailey*, the parent of an Army recruit filed a wrongful death suit under the Federal Tort Claims Act against two Army recruiters and the United States, alleging that they "negligently caused her son's death by instructing him to use dangerous weight-loss methods to meet Army enlistment standards."[28]

> To support her allegations, plaintiff engaged Dr. Jeffrey B. Noftz II, a primary care and sports medicine physician, to opine on the cause of Wilsey's death. In his expert report, Dr. Noftz concludes "it is my opinion that Mr. Wilsey's rapid and significant weight loss and the methods used to achieve this weight loss which included extreme low-calorie intake, purging, use of sweat garments and diuretics coupled with the potential for a pre-existing heart valve abnormaility and use of [asthma medication] for wheezing placed him at significant risk for electrolyte abnormalities and lethal cardiac arrythmia."
>
> Dr. Noftz later testified, however, that without an autopsy and premortem blood analysis, it is impossible to make a definitive diagnosis ruling out possible cardiac and non-cardiac causes of death unrelated to Wilsey's diet and exercise regime. He also admitted he lacked "[v]ery important" information regarding Wilsey's activities in the forty-eight hours preceding his death.[29]

The district court ruled that Dr. Noftz's expert opinion was inadmissible because, while the materials relied on by Dr. Noftz might "suffice to 'rule in' electrolyte imbalance as a potential cause of Wilsey's cardiac dysrhythmia, they are not sufficient to 'rule out' possible cardiac and non-cardiac causes of death unrelated to Wilsey's diet and exercise regime."[30] Dr. Noftz's "conclusion was at best a working hypothesis, not admissible scientific "knowledge."[31]

---

[27] 115 F. Supp.3d 882 (N.D. Ohio 2015).

[28] *Id.* at 886.

[29] *Id.* at 888 (citations omitted).

[30] *Id.* at 892.

[31] *Id.*

Similarly, Dr. LaBoy agreed that people can die in hot environments for reasons other than heat and testified that his findings would also be consistent with sudden cardiac death. Under the reasoning of *Bailey*, Dr. LaBoy did not sufficiently rule other causes of death.[32]

Dr. Laboy's opinion must also be excluded as unreliable because his methodology is flawed. Despite acknowledging that people die in a hot environment from causes other than heat,[33] Dr. Laboy's description of his methodology makes clear that, before the autopsy even began, he assumed that heat stroke was the cause of Johnson's death based on the environmental conditions in which his body was found. Dr. Laboy failed to reliably rule out or even meaningfully consider any other cause of death.

Dr. Laboy testified that he relied on an investigator's report, which described the temperature of Johnson's apartment at the time that Johnson's body was found[34] and contained a statement that there were no utilities in the apartment,[35] and he reviewed the information regarding the weather history before he concluded that Johnson died as a result of probable heat stroke.[36] Dr. Laboy acknowledged that, during periods of hot weather, he presumes that deaths such as Johnson's are heat related.[37] Dr. Laboy's testimony shows only that Johnson was found

---

[32] (Dep. Dr. Laboy, p. 44, ECF No. 111-5.)

[33] (*Id.*)

[34] Plaintiffs acknowledge that Dr. Laboy's opinion would have been sounder if he had had access to Johnson's body temperature at the time of his death. (Pls' Resp. p. 3, ECF No. 122.) ("[W]ith additional information, such as the core body temperature at the moment of death, Dr. Laboy could have established with absolute certainty, that a heat stroke was the cause of death; however, the lack of information was no fault of his own.")

[35] (*Id.* pp. 32 – 33.)

[36] (*Id.* p. 51.)

[37] (*Id.* p. 80.)

9

in a hot environment and that hot environments may cause heat stroke. "Essentially, this is a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy throat, runny nose, nasty cough and wears a watch, they have a watch-induced cold."[38]

Dr. Laboy's failure to meaningfully consider alternative causes of death is further demonstrated by his statement that Johnson had "no significant past medical history."[39] Dr. Laboy testified that he reviewed medical records from Johnson's primary care physician, Dr. Barbara Geater.[40] However, Dr. Laboy's office did not receive Dr. Geater's medical records until after he had completed the preliminary autopsy report and reached his conclusion.[41] Dr. Laboy's office received only a single page of progress notes from Dr. Geater.[42]

The complete medical records contain additional pages of information, including the results of lab testing performed on Johnson in May of 2011, with several values that are noted as being outside the reference range.[43] These records also contain a letter to Johnson dated approximately three months before his death stating that Dr. Geater's office had been unable to reach Johnson despite several attempts. The letter states that "we need you to call the office to discuss your lab results" and that "[i]t is very important that you do so as soon as possible."[44]

---

[38] *Tamraz*, 620 F.3d at 673.

[39] (Pls' Exp Disc.p. 2, ECF No. 111-1.)

[40] (Dep. Dr. Laboy p.22, ECF No. 111-5.)

[41] (*Id.* pp. 86 - 87.)

[42] (*Id.* pp. 101 -102.)

[43] (ECF No. 111-7.)

[44] (*Id.* p. 2.)

Dr. Laboy did not review this information in making his determination as to Johnson's cause of death, although he did look at it later and testified that the records of Dr. Geater did not show an underlying condition that altered his opinion as to the manner and cause of Johnson's death.[45]

Dr. Laboy did not explain why heat stroke caused Johnson's death other than to state that Johnson was found in a hot environment and that hot environments may cause heat stroke, and he failed to analyze or rule out alternate causes such as cardiac arrest. Such a speculative opinion is based on unreliable methodology and must be excluded under *Daubert* and *Best*. Accordingly, the motion to exclude Dr. Laboy's opinion regarding Johnson's cause of death from the trial of this matter is **GRANTED**.

IT IS SO ORDERED.

s/ S. Thomas Anderson

S. THOMAS ANDERSON
U.S. DISTRICT COURT JUDGE

DATE: March 28, 2016.

---

[45] (Pls' Resp. pp.4-6 (quoting Dep. of Dr. Laboy pp. 106-07) ECF No. 122.)